344 F.3d 920
 State of CALIFORNIA ex rel. RONO, LLC, Plaintiffs-Appellants,
v.
ALTUS FINANCE S.A.; CDR Creances; Credit Lyonnais USA; Jean-Francois Henin, Defendants, and
CDR Enterprises; Consortium de Realisation S.A.; Mutuelle Assurance Artisanale de France; Mutuelle Assurance Artisanale de France Vie S.A.; Omnium Geneve S.A.; Credit Lyonnais S.A.; Aurora National Life Assurance Company; New California Life Holdings, Inc.; Artemis S.A.; Artemis Finances S.N.C.; Aurora S.A.; Artemis America Partnership; Francois Pinault; Apollo Advisors L.P.; Leon D. Black; Craig M. Cogut; Credit Lyonnais Securities, Inc.; John J. Hannan; Lion Advisors L.P.; Pegasus Insurance Partners, L.L.P.; Eric B. Siegel, Defendants-Appellees.
 No. 02-56038.
 United States Court of Appeals, Ninth Circuit.
 Filed September 15, 2003.
 
 Arthur J. Shartsis, Shartsis, Friese & Ginsburg, San Francisco, CA, Jan Zabriskie, DAG, Attorney General's Office, Sacramento, CA, Brian D. Daly, Beck, Decorso, Daly, Barrera & Kreindler, Los Angeles, CA, for Plaintiffs-Appellants.
 No appearance, for Defendant.
 Travers D. Wood, C. Randolph Fishburn, White & Case, Los Angeles, CA, Thomas McGanney, White & Case, New York, NY, Richard J. Ney, Chadbourne & Parke, Los Angeles, CA, Whitney I. Gerard, New York, NY, Stanley G. Roman, Krieg, Keller, Sloan, Reilley & Roman, San Francisco, CA, Lionel Aeschlimann, Switzerland, Lawrence B. Friedman, Cleary Gottlieb Steen & Hamilton, New York, NY, Theodore N. Miller, Sidley Austin Brown & Wood, Los Angeles, CA, Richard D. Bernstein, Sidley Austin Brown & Wood LLP, Washington, DC, Robert L. Weigel, Gibson, Dunn & Crutcher, New York, NY, Robert S. Warren, Gibson, Dunn & Crutcher, Los Angeles, CA, Marshall R. King, Gibson, Dunn and Crutcher, LLP, New York, NY, James E. Lyons, Skadden, Arps, Slate, Meagher & Flom, San Francisco, CA, John J. Quinn, Arnold & Porter, Los Angeles, CA, Joseph Nocella, White & Case, Los Angeles, CA, for Defendants-Appellees.
 Before: A. Wallace TASHIMA, Marsha S. BERZON, and Richard R. Clifton, Circuit Judges.
 
 ORDER
 
 1
 Pursuant to Rule 29.8 of the California Rules of Court, we grant the motion of the Attorney General and request the California Supreme Court to decide the two questions of California law set forth in Part II of this order. This case is withdrawn from submission until further order of this court and all further proceedings in this court are stayed pending final action by the California Supreme Court.
 
 
 2
 There are no controlling precedents resolving these important questions, and the answers will in all probability determine the outcome of the present appeal. Our phrasing of the questions below is not meant to restrict the California Supreme Court's consideration of the issues involved. We agree to follow the answers provided by the California Supreme Court.
 
 
 3
 * CAPTION AND COUNSEL
 
 
 4
 The State of California ex rel. RoNo, LLC, is deemed the petitioner in this request because California appeals from the district court's adverse rulings on the specified issues. The caption of the case is:
 
 
 5
 STATE OF CALIFORNIA ex rel. RONO, LLC, Plaintiffs-Appellants, v.
 
 
 6
 ALTUS FINANCE S.A.; CDR CREANCES; CREDIT LYONNAIS USA; JEAN-FRANCOIS HENIN, Defendants, and
 
 
 7
 CDR ENTERPRISES; CONSORTIUM DE REALISATION S.A.; MUTUELLE ASSURANCE ARTISANALE DE FRANCE; MUTUELLE ASSURANCE ARTISANALE DE FRANCE VIE S.A.; OMNIUM GENEVE S.A.; CREDIT LYONNAIS S.A.; AURORA NATIONAL LIFE ASSURANCE COMPANY; NEW CALIFORNIA LIFE HOLDINGS, INC.; ARTEMIS S.A.; ARTEMIS FINANCES S.N.C.; AURORA S.A.; ARTEMIS AMERICA PARTNERSHIP; FRANCOIS PINAULT; APOLLO ADVISORS L.P.; LEON D. BLACK; CRAIG M. COGUT; CREDIT LYONNAIS SECURITIES, INC.; JOHN J. HANNAN; LION ADVISORS L.P.; PEGASUS INSURANCE PARTNERS, L.L.P.; ERIC B. SIEGEL, Defendants-Appellees.
 
 The names and addresses of counsel are:
 
 8
 For the State of California: Jan Zabriskie, Attorney General's Office, State of California, Sacramento, CA. Arthur J. Shartsis, Shartsis, Friese & Ginsburg, San Francisco, CA.
 
 
 9
 For RoNo, LLC: Brian D. Daly, Beck, Decorso, Daly, Barrera & Kreindler, Los Angeles, CA.
 
 
 10
 For Altus Finance S.A., CDR Creances, Crédit Lyonnais USA, Jean-François Henin: No appearance.
 
 
 11
 For CDR Enterprises and Consortium de Réalisation S.A.: Travers D. Wood, C. Randolph Fishburn, White & Case, Los Angeles, CA; Thomas McGanney, White & Case, New York, N.Y.
 
 
 12
 For Mutuelle Assurance Artisanale de France and Mutuelle Assurance Artisanale de France Vie S.A.: Richard J. Ney, Chadbourne & Parke, Los Angeles, CA 90071; Whitney I. Gerard, Chadbourne & Parke, New York, N.Y.
 
 
 13
 For Omnium Genève S.A.: Stanley G. Roman, Krieg, Keller, Sloan, Reilley & Roman, San Francisco, CA; Lionel Aeschlimann, Geneva 3, Switzerland.
 
 
 14
 For Crédit Lyonnais S.A. and Crédit Lyonnais Securities, Inc.: Travers D. Wood, C. Randolph Fishburn, Joseph Nocella, White & Case, Los Angeles, CA 90071-2007; Thomas McGanney, White & Case, New York, N.Y.; Lawrence B. Friedman, Cleary Gottlieb Steen & Hamilton, New York, N.Y.
 
 
 15
 For Aurora National Life Assurance Company and New California Life Holdings, Inc.: Theodore N. Miller, Sidley Austin Brown & Wood, Los Angeles, CA; Richard D. Bernstein, Sidley Austin Brown & Wood, Washington, DC.
 
 
 16
 For Artemis S.A., Artemis Finances S.N.C., Artemis America Partnership, Aurora, S.A., and François Pinault: Robert S. Warren, Gibson, Dunn & Crutcher, Los Angeles, CA; Marshall R. King, Robert L. Weigel, Gibson, Dunn & Crutcher, New York, N.Y.
 
 
 17
 For Apollo Advisors L.P., Leon D. Black, Craig M. Cogut, John J. Hannan, Lion Advisors L.P., Pegasus Insurance Partners, and Eric B. Siegel: James E. Lyons, Skadden, Arps, Slate, Meagher & Flom, San Francisco, CA; John J. Quinn, Arnold & Porter, Los Angeles, CA.
 
 
 18
 For Amicus Curiae National Organization of Life and Health Insurance Guaranty Associations: Wm. Carlisle Herbert, Kathleen R. Pasulka-Brown, Susanne R. Blossom, Foley & Lardner, Angeles, CA.
 
 II
 QUESTIONS OF LAW
 
 19
 The questions of law we wish to be answered are:
 
 
 20
 A. Can the Attorney General pursue civil remedies, under the California False Claims Act, Cal. Gov't Code § 12650 et seq., and the California Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 et seq., concerning the assets of an insolvent insurance company for which the Insurance Commissioner is acting as conservator or liquidator, or does the California Insurance Code, particularly section 1037, give exclusive authority to the Insurance Commissioner to bring civil actions?
 
 
 21
 B. Do assets to which the California Insurance Commissioner acquires title from an insolvent insurance company under California Insurance Code section 1101 constitute "state funds" within the meaning of the California False Claims Act, Cal. Gov't Code § 12650(b)(1)?
 
 III
 STATEMENT OF FACTS
 
 22
 As this case was dismissed on the pleadings for failure to state a claim, we take the following alleged facts as true, construing the complaint in the light most favorable to the plaintiffs:[1]
 
 
 23
 More than a decade ago, Executive Life Insurance Company (ELIC), a California insurance company with approximately 300,000 insureds, became insolvent when many policyholders cashed out their policies because of concerns about ELIC's large junk bond portfolio. Pursuant to California law, the state's Insurance Commissioner ("the Commissioner") seized ELIC's assets on April 11, 1991 by order of the California Superior Court and put ELIC into conservatorship.
 
 
 24
 The Commissioner adopted and implemented a two-part plan to rehabilitate ELIC. First, appellee Altus Finance S.A. ("Altus"), a French company, purchased the company's junk bond portfolio. Second, other French investors, the MAAF Group, formed a holding company, New California Life Holdings (NCLH),[2] that in turn purchased ELIC's insurance business and named the new company Aurora National Life Assurance Company ("Aurora").
 
 
 25
 According to the Attorney General, the corporation behind these transactions was Crédit Lyonnais, a French bank owned in part by the government of France, operating through its subsidiary, Altus. Crédit Lyonnais and affiliated companies are among the appellees here, along with American investment bankers (the "Apollo" parties) and other purported co-conspirators who acted as fronts for Altus. The complaint posits that "[t]he Commissioner did not know that the MAAF Group was controlled by Altus or that Apollo would share in the profits generated by the Insurance Business or the Bonds. California law required disclosure of such an interest." Moreover,
 
 
 26
 Apollo and Altus/Credit Lyonnais knew they could not meet the announced bidding requirements ... because neither had any experience operating an insurance business, and state and federal law prohibited Altus from owning or operating the insurance business anyway. Apollo also knew that the Commissioner would not approve of Apollo acquiring any financial interest in the insurance business because of its bad public image as a result of its extensive connections with Drexel [Burnham Lambert] and Michael Milken.
 
 
 27
 The Attorney General alleges that Altus fraudulently acquired ELIC's insurance company assets from the Commissioner, in violation of state insurance and federal banking law. California Insurance Code § 699.5 precludes foreign governments, agencies, or subdivisions thereof from owning, operating, or controlling, directly or indirectly, a California insurance company. The Bank Holding Company Act, 12 U.S.C. § 1841 et seq., prohibits a foreign bank from owning an American insurance company.
 
 
 28
 Altus and its fronts purportedly made false statements denying that Crédit Lyonnais would have any equity interest or control over the buyers. Yet, after Altus secretly acquired the insurance company assets, "[u]sing a back-dated and falsified agreement, Altus sold Artemis [S.A., a French company owned in part by appellees Crédit Lyonnais and François Pinault] the insurance business, and Apollo orchestrated the timing of formal transfers of ownership from the phony fronts to Artemis in order to avoid public scrutiny." The complaint states that, "[h]ad the true facts been disclosed, the Commissioner could not and would not have approved the Altus/ NCLH bid."
 
 
 29
 Artemis subsequently obtained the Commissioner's approval to buy shares in NCLH from the MAAF Group, using applications that did not disclose the Artemis-Altus relationship. By 1995, Artemis had acquired all of the MAAF Group's interest in NCLH and therefore controlled Aurora.
 
 
 30
 After the Commissioner discovered that the purchasers of ELIC's insurance company assets were controlled by prohibited foreign entities, he filed suit in state court on February 18, 1999, alleging fraud and seeking damages.[3] Crédit Lyonnais removed the case to federal court. The same district judge who decided the instant case is hearing that litigation, in which most of the defendants are also defendants here.
 
 
 31
 Also in February 1999, a qui tam plaintiff (RoNo LLC) filed a sealed whistle-blower complaint. The Attorney General intervened in the qui tam action, which was subsequently removed by appellees to federal court based on the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 et seq., and consolidated with the Commissioner's action for discovery and pre-trial purposes. In January 2002, the Attorney General filed his First Amended Complaint, naming the Apollo parties as additional defendants. The Attorney General asserts that the state of California was damaged in an amount in excess of $2 billion by the appellees' unlawful transactions, because the ELIC business could have been sold to other entities at a higher price and a lower cost had the truth been known, with the result that more money would have been available for ELIC's policyholders.
 
 
 32
 The present lawsuit seeks, inter alia, treble damages under the California False Claims Act (CFCA), Cal. Gov't Code § 12650 et seq., as well as "civil penalties and an order for restitution of all monies and property obtained and disgorgement of all profits derived ... as well as injunctive relief" under the Unfair Competition Law (UCL), Cal. Bus. & Prof.Code § 17200 et seq.
 
 
 33
 The district court found that California Insurance Code section 1037(f)[4] precludes the Attorney General from prosecuting this action. The court expressed concern that the Attorney General's claims are "utterly dependent on the testimony of the Insurance Commissioner.... Plaintiff has failed to make a single argument (and this Court cannot conceive of one) why it is necessary or even beneficial for two entirely separate and different agencies of the Executive Branch of the State of California to pursue virtually identical claims against substantially the same defendants." As a matter of statutory interpretation, the district court held that "[a]lthough these respective cases have been consolidated for discovery and probably could be consolidated at trial, the continued prosecution of superfluous lawsuits causes inherent and great delay, huge additional expenses and a host of complicated conceptual and practical problems. The California Legislature surely did not intend such a result when it enacted section 1037(f) of the Insurance Code."
 
 
 34
 Addressing the Attorney General's argument that under the CFCA he is, as required,[5] making claims involving state property rather than ELIC's assets as an insolvent insurance company, the district court noted that the Attorney General admitted that the underlying transactions had "diverted [no money] from the State's general fund." The court found that no state property was at issue because "[t]he Commissioner holds title to the assets of an insolvent insurer as a trustee for the benefit of creditors and other persons interested in the estate of the insolvent insurer.... [T]his suit is ultimately about the alleged wrongdoing of the defendants in connection with the State's disposition of ELIC's assets."
 
 
 35
 The district court therefore dismissed all of the Attorney General's claims for lack of authority to pursue the action.
 
 IV
 STATEMENT OF REASONS FOR THE REQUEST
 
 36
 This case implicates core sovereign interests of the state of California. It may have wide ramifications for delineating the scope of authority to enforce state laws between two of California's constitutionally-designated "state officers," the Attorney General and the Insurance Commissioner.[6] See Cal. Const. art. 3 § 8(l) ("`State officer,' as used in this section, means the Governor, Lieutenant Governor, Attorney General, Controller, Insurance Commissioner, Secretary of State, Superintendent of Public Instruction, Treasurer, member of the State Board of Equalization, and Member of the Legislature."). The Attorney General argues that "in practical effect, [the district court's ruling] entirely bars enforcement of a number of statutory civil remedies for fraud and unfair competition arising out of insurance insolvency proceedings," adding more broadly that "the district court's interpretation of the Insolvency Act would limit the scope of all law enforcement statutes under State law." Moreover, there may be a state constitutional dimension involved, as the Attorney General invokes California Constitution Article V, section 13, which states that he has the power and the duty to see that the State's laws are uniformly and adequately enforced. Appellees counter that an outcome favoring the Attorney General "would effectively nullify all legislative regulatory schemes where compliance enforcement has been vested in an executive branch officer."
 
 
 37
 Thus, this case involves knotty issues of internal state governance. As a matter of comity, we consider the California Supreme Court better positioned to address the two questions presented, which we understand for the following reasons to be open issues under state law.
 
 
 38
 A. Allocation of Power Between Two State Officers
 
 
 39
 The Attorney General disputes the district court's conclusion that the Commissioner has exclusive authority to pursue this litigation. It is the Attorney General's position that the Commissioner has no authority to bring a CFCA action and that the Commissioner cannot seek penalties under the UCL, which would be cumulative to any recovery by the Commissioner pursuant to California Business and Professions Code section 17205. Moreover, the Attorney General emphasizes that his claims, underpinned by the state's sovereign power of law enforcement, are different from those being brought by the Commissioner. Should the Attorney General prevail, treble damages are automatic under the CFCA, while the punitive damages sought by the Commissioner are not. In addition, the elements of fraud to be proven in the two lawsuits differ, to the advantage of the Attorney General. See Cal. Gov't Code §§ 12650(b), 12651(a)(providing that the CFCA does not require the Attorney General to establish elements of intent and reliance, which the Commissioner must under the UCL). More broadly, the Attorney General maintains, the legal actions taken by the Commissioner as a conservator advance distinct sovereign interests from those furthered by the Attorney General's attempt to punish and deter the fraudulent conduct alleged.
 
 
 40
 With regard to appellees' contention that Insurance Code section 1037 mandates exclusivity for the Commissioner, the Attorney General responds that section 1037 "provides that the State, acting through the Commissioner as the statutory successor in interest, may do what `that person,' that is, the insolvent insurer, could have done." See Texas Commerce Bank v. Garamendi, 28 Cal.App.4th 1234, 1245, 34 Cal.Rptr.2d 155 (1994) ("[T]he commissioner is a public official acting on behalf of the state when dealing with insolvent insurers in general, but once appointed conservator of a particular insolvent insurer, the commissioner steps into the shoes of that insurer."). According to the Attorney General, "the Commissioner's exclusive powers are limited to those he exercises as a `conservator or liquidator.'" Because the present suit could not be brought in the Commissioner's or ELIC's name, this argument concludes, the action is not barred by the exclusivity limitation of section 1037's preamble.
 
 
 41
 In support of this statutory interpretation, the Attorney General cites cases in which law enforcement prosecutions by his office were allowed despite the existence of parallel (though not exclusive) authority in other state agencies. See, e.g., People v. McKale, 25 Cal.3d 626, 159 Cal.Rptr. 811, 602 P.2d 731, 734 (1979). The Attorney General also relies on Farmers Insurance Exchange v. Superior Court, 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992). In Farmers, the Attorney General had filed suit against insurers under the Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 et seq. The Insurance Commissioner had not yet acted administratively against the insurers pursuant to the McBride Act, a component of the Insurance Code, and was therefore accorded primary jurisdiction, precluding the Attorney General's action, but only until agency review was complete. In so ruling, the California Supreme Court stated that the enactment of the Unfair Practices Act subsequent to the McBride Act "merely modifies preexisting law, to provide, in essence, that insurers are subject to the unfair business practices laws in addition to preexisting regulations under the McBride Act, as amended." Farmers, 6 Cal.Rptr.2d 487, 826 P.2d at 741. This decision may support the Attorney General's reading of the UCL as complementary to the Insurance Code.
 
 
 42
 Appellees counter in part by arguing that other California cases hold that the Commissioner's powers are exclusive regardless of the competing plaintiff's status: The Commissioner alone is authorized to bring civil actions concerning the assets of an insolvent insurance company. See In re Executive Life Ins. Co., 32 Cal.App.4th 344, 356, 38 Cal.Rptr.2d 453 (1995) (the Insurance Code authorizes the Commissioner as conservator to "exercise[] the state's police power to carry forward the public interest and to protect policyholders and creditors of the insolvent insurer"). To further their argument that the Commissioner's authority under section 1037(f) is exclusive even when juxtaposed with the Attorney General's authority under the CFCA and the UCL, appellees draw on an Opinion of the Attorney General, Op. No. 45-294 (May 3, 1946). The Opinion was issued before the enactment of either the CFCA or the UCL and construed the exclusivity provision of the Insurance Code, "a special statute dealing with a particular function of a particular officer," to prevail over a "general statute," Cal. Gov't Code § 11009, which required prior approval by the Director of Finance for certain transactions by state agencies. Id. at 264. Appellees also rely on two cases in which the Attorney General brought common law claims that were rejected due to the Legislature's "intent to occupy the field," Van de Kamp v. Gumbiner, 221 Cal.App.3d 1260, 1284, 270 Cal.Rptr. 907 (1990), and People v. New Penn Mines, 212 Cal.App.2d 667, 28 Cal.Rptr. 337 (1963), and on Quackenbush v. Superior Court, 79 Cal.App.4th 867, 94 Cal.Rptr.2d 282 (2000), which interpreted section 1037's use of the term "exclusively." Quackenbush held that the Commissioner possesses exclusive authority "to prosecute and defend any and all suits and other legal proceedings for the purpose of collecting debts and claims due to a liquidated insurance company. ... [A]s Cal-American's liquidator, the Commissioner has been given the exclusive right to pursue, collect and sue on any and all claims that Cal-American may have." Id. at 872-74, 94 Cal.Rptr.2d 282. Quackenbush is not on its face inconsistent with the Attorney General's position, however, as he does not oppose the contention that it is as a liquidator (or conservator) that the Insurance Commissioner has exclusive authority, and not otherwise.
 
 
 43
 None of these cases appears directly to address the present situation. The Attorney General in this case is claiming explicit statutory authority to sue alongside the Commissioner, not relying on common law powers. Cf. Garcia v. McCutchen, 16 Cal.4th 469, 66 Cal.Rptr.2d 319, 940 P.2d 906, 911 (Cal.1997) (holding that implied repeal will be found only when there is no rational basis for harmonizing two potentially conflicting statutes). Appellees' cases do not, in our view, address the Attorney General's claim to be the appropriate state official to bring suit for wrongs committed against the state. The Insurance Commissioner's exclusive authority under section 1037(f) may be limited to his roles as conservator or liquidator, leaving room for the Attorney General to engage in parallel legal action so long as it does not involve conservatorship or liquidation matters.
 
 
 44
 Finally, appellees present policy arguments to support their position. We firmly believe that these are appropriately within the ken of the California Supreme Court to address, and outline them here only to supplement our sense of the equipoise in which the primary question of statutory interpretation is suspended.
 
 
 45
 First, noting that the Attorney General's original complaint asserted claims based on ELIC's assets and on the losses of its policyholders, appellees claim that the Attorney General's prosecution of this action is a direct duplication of the Commissioner's authority. The Insurance Code provides that the Attorney General has the right to serve as the Commissioner's counsel in conservancy proceedings. See Cal. Ins.Code § 1036 (incorporating Cal. Gov't Code § 11040). This provision suggests, according to appellees, that the legislature's intent was to preclude competing proceedings in which the Commissioner's actions are potentially at odds with those of the Attorney General. The appellees use the Low action as an example. There, the Commissioner, acting without the Attorney General as counsel, granted a release from liability to the Apollo parties, while joining some defendants not sued by the Attorney General in this case.
 
 
 46
 Appellees further question the potential dilution of the pool of ELIC's assets available to compensate policyholders were the Attorney General's action permitted to proceed. CFCA recoveries by the qui tam plaintiff (at least 15%) and the Attorney General (33%), see Cal. Gov't Code § 12652(g)(2), as well as UCL recovery by the treasurer of Los Angeles County, see Cal. Bus. & Prof.Code § 17206(c),[7] could interfere with the Commissioner's primary responsibility to the policyholders directly affected by ELIC's insolvency. See Cal. Ins.Code § 1033 ("Preferred claims"); Executive Life Ins. Co., 32 Cal.App.4th at 365, 38 Cal.Rptr.2d 453(insolvency regime is designed "to protect policyholders of insolvent insurers by a process of rehabilitation").
 
 
 47
 A third policy concern presented by appellees is the possible disincentive to settlement that would result from the shadow of Attorney General-driven litigation looming over the Commissioner's efforts at conservatorship. The state would retain opportunities to punish fraud such as that alleged in the present case, appellees argue, even if section 1037 were read to bestow exclusivity on the Commissioner. First, the Commissioner has some independent authority to levy civil penalties. See Cal. Ins.Code §§ 790.035(a), 1215.10(b). In addition, criminal charges, possibly including financial penalties, could be pursued by the state with respect to any fraudulent transactions. See id. § 12928(Commissioner must refer insurers' violations of the penal code and "other laws" to district attorneys).
 
 
 48
 The Attorney General rejoins that the Commissioner's action against all or some of the appellees who are defendants in both actions could be unsuccessful, while his own claims, subject to lower standards of proof and higher damages, might in that event vindicate the policyholders. Moreover, the Attorney General's recovery, were it allowed under the CFCA, would leave the actual damages (one-third of a treble award) to revert to the state. "[P]ursuant to the provisions of the Insolvency Act," the Attorney General represents, these monies will be distributed to policyholders and creditors. This point is disputed, as appellees contend that under People v. Honig, 48 Cal.App.4th 289, 55 Cal.Rptr.2d 555 (1996), "if Appellant recovered under the CFCA, the AG could not legally distribute a portion of that recovery to the policyholders."
 
 
 49
 In sum, we find that the question presented concerning the Attorney General's authority to prosecute the present action is so close on all grounds — statutory language, precedent, and policy — as to justify our request for guidance from the California Supreme Court, in light of the importance of properly allocating powers between the state constitutional officers involved.
 
 B. "State Funds" Under the CFCA
 
 50
 The Attorney General contends that the state's relationship to ELIC's assets was sufficient to permit him to bring his action under the CFCA. The CFCA defines a "claim" as "any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter `state funds')." Cal. Gov't Code § 12650(b)(1) (emphasis added). The crux of this second issue is whether the Commissioner's conservatorship meant that ELIC's assets became, temporarily, "state funds," as defined in section 12650(b)(1).
 
 
 51
 In support of his interpretation of "state funds," the Attorney General argues that "the State held title in the Property pursuant to Insurance Code section 1011 and the Superior Court's April 11, 1991 Order. The State had the right to, and did, in fact, exercise dominion and control over the property." The Attorney General's position is based on the 1991 Order of Conservation transferring to the "Insurance Commissioner of the State of California ... in his official capacity and pursuant to the provisions of the California Insurance Code ... all title, both legal and equitable[,] to all of [ELIC's] assets."
 
 
 52
 The Attorney General maintains that the assets qualify because they were "issued from" the state. This line of reasoning posits that "issuance" encompasses a transfer or conveyance, so the CFCA can apply to funds under the state's supervision or control regardless of the impact of the alleged fraud on the public treasury. Appellees respond that decisions such as LeVine v. Weis, 68 Cal.App.4th 758, 765, 80 Cal.Rptr.2d 439 (1998), make clear that the purpose of the CFCA is "to protect the public fisc" and argue that the Commissioner's appointment as conservator did not convert ELIC's assets into "state funds."
 
 
 53
 The district court relied on Carpenter v. Pacific Mutual Life Insurance Co., 10 Cal.2d 307, 74 P.2d 761 (1937), aff'd sub nom. Neblett v. Carpenter, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938), to conclude that "the assets to which the Commissioner, as an officer of the State, holds title do not become State property in the manner, for example, that land the State acquires pursuant to eminent domain becomes an asset of the State. Rather, the Commissioner serves as a trustee of those assets on behalf of the insurer's creditors." Carpenter was a case in which the Commissioner used an insolvent insurer's assets to purchase stock in the new insurance company formed after rehabilitation.
 
 
 54
 The appellants alleged a state constitutional violation, noting that a provision of the California Constitution prohibited the state from "loan[ing] its credit [or] subscrib[ing] to or be[ing] interested in the stock of any company, association, or corporation." Id. at 780. The California Supreme Court rejected the proposition that the Commissioner's rehabilitation actions transformed the state into a stockholder of the insurance company concerned:
 
 
 55
 Section 1057 of the Insurance Code ... expressly provides that in all proceedings thereunder the commissioner acts as trustee for the benefit of all of the creditors of the insolvent company. It is quite clear that the commissioner by subscribing to the stock of the new company has not loaned the credit of the state to the new company. Not a penny of state money has gone into the treasury of the new company. No liability under the agreement is imposed on the conservator either in his official or personal capacity. There was no loan of credit at all. The commissioner acting pursuant to a statute, with court approval, took certain assets of the old company and transferred them to the new company in exchange for the stock which he holds as trustee for the benefit of the creditors of the old company. Obviously, the commissioner as a state officer did not subscribe to the stock of the new company so as to make the state a stockholder.
 
 
 56
 
 Id.
 
 
 
 57
 Carpenter also emphasized, however, that "[o]f course the insurance commissioner is a state officer." Id. So the division proposed by appellees between the Commissioner as state official and the Commissioner as trustee of private funds may not be dispositive in demarcating "state funds," as the Commissioner is both.
 
 
 58
 Further, while it is clear that the Commissioner's role in the insolvency is that of a trustee, see Cal. Ins.Code § 1057, the "state funds" question in this case arises under the CFCA, which defines "state funds" in a somewhat sui generis manner. Carpenter's holding that the state was not a shareholder despite the Commissioner's possession of shares does not address the subsequently enacted "issued from, ... or provided by, the state" language of the CFCA, and therefore cannot determine the question whether the assets at issue in this case are "state funds" under that definition.
 
 
 59
 Carpenter did observe that section 1011 of the Insurance Code "vest[s] the commissioner with title to all the assets of the company," 74 P.2d at 775, and still ruled against the contention that the state's interest in the property was such as to render the state "interested" in the stock of the company within the meaning of the relevant constitutional provision. Other provisions of the Insurance Code may support the proposition that the assets of an insolvent insurance company are not properly considered state funds. See, e.g., Cal. Ins.Code § 1019 (addressing "creditors, policyholders, shareholders and members, and all other persons interested in [a liquidated insurer's] assets, including the State of California"). Yet the Insurance Code was enacted a half-century before the CFCA, and the pertinent CFCA definition of "state funds" has not been addressed by controlling precedent. We therefore believe that a request to the California Supreme Court to harmonize these statutes is proper.
 
 V
 
 60
 Pursuant to California Rule of Court 29.8(d), the Clerk of this court shall forward an original and 10 copies of this order, under official seal, to the California Supreme Court, along with a certificate of service on the parties, and copies of all briefs, excerpts of record, requests for judicial notice, and post-argument letters that have been filed with this court.[8]
 
 
 61
 The parties shall notify the Clerk of this court within 14 days of any decision by the California Supreme Court to accept or to decline our request. If the California Supreme Court accepts, the parties shall file a joint report six months after the date of acceptance and every six months thereafter advising us of the status of the proceedings. The parties shall also notify the Clerk of this court within 14 days of the issuance of an opinion by the California Supreme Court.
 
 
 62
 IT IS SO ORDERED.
 
 
 
 Notes:
 
 
 [1]
 See, e.g., Zimmerman v. City of Oakland, 255 F.3d 734, 737 (9th Cir.2001).
 
 
 [2]
 The MAAF Group owned two-thirds of NCLH
 
 
 [3]
 If this lawsuit, referred to as the "Low action," No. CV 99-2829 AHM (CWx), is successful, it may, according to the district court, result in "billions of dollars in compensatory damages and additional billions in punitive damages." The Commissioner is also pursuing a separate action against five defendants not named by the Attorney General in this case. See Garamendi v. SDI Vendome S.A., 276 F.Supp.2d 1030, 2003 WL 21920907 (C.D.Cal. Aug. 4, 2003).
 
 
 [4]
 Section 1037 states in relevant part:Authority of commissioner as liquidator or conservator
 Upon taking possession of the property and business of any person in any proceeding under this article, the commissioner, exclusively and except as otherwise expressly provided by this article, either as conservator or liquidator:
 [...]
 (f) May, for the purpose of executing and performing any of the powers and authority conferred upon the commissioner under this article, in the name of the person affected by the proceeding or in the commissioner's own name, prosecute and defend any and all suits and other legal proceedings, and execute, acknowledge and deliver any and all deeds, assignments, releases and other instruments necessary and proper to effectuate any sale of any real and personal property or other transaction in connection with the administration, liquidation, or other disposition of the assets of the person affected by that proceeding; and any deed or other instrument executed pursuant to the authority hereby given shall be valid and effectual for all purposes as though it had been executed by the person affected by any proceeding under this article or by its officers pursuant to the direction of its governing board or authority. [...]
 The enumeration, in this article, of the duties, powers and authority of the commissioner in proceedings under this article shall not be construed as a limitation upon the commissioner, nor shall it exclude in any manner his or her right to perform and to do such other acts not herein specifically enumerated, or otherwise provided for, which the commissioner may deem necessary or expedient for the accomplishment or in aid of the purpose of such proceedings.
 
 
 [5]
 See Cal. Gov't Code § 12650(b)(1) ("`Claim' includes any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter `state funds')....").
 
 
 [6]
 We note that at oral argument counsel for the Attorney General represented that he was authorized to state that the Insurance Commissioner concurs with his motion to certify the questions of state law in this case to the California Supreme Court
 
 
 [7]
 "If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the State General Fund."
 
 
 [8]
 With the filing of this order, appellant's motion to strike is GRANTED in part. Pages 5 (entire) to 16 (first two lines) of appellees Aurora National Life Assurance Company and New California Life Holdings' brief are stricken. The remainder of appellant's motion is DENIED
 All requests for judicial notice are GRANTED to the extent that they are compatible with Federal Rule of Evidence 201 and do not require the acceptance of facts "subject to reasonable dispute." Cf. Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir.2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.") (internal quotation marks and citation omitted).
 Appellant's objections to appellee Aurora S.A.'s supplemental excerpts of record are OVERRULED, as all the documents included were filed with the district court.